***********
The Full Commission has considered the record of the proceedings before the Deputy Commissioner, the briefs and oral arguments on appeal, and the additional testimony of Dr. Whitmer submitted subsequent to the Full Commission argument. Having reconsidered the evidence and the additional testimony, the Full Commission AFFIRMS the decision of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The average weekly wage is as shown on the attached Form 22.
3. Plaintiff/Employee was employed by Defendant/Employer at the time shown by the evidence.
4. Defendant/Employer is self-insured with Gallagher Bassett Services, Inc., acting as Third Party Administrator.
5. The issue for determination is as follows:
Whether Plaintiff suffered an injury by accident or occupational disease on or about June 29, 2000; and if so, what benefits are due Plaintiff.
 ***********
Based upon all the competent evidence of record, the Full Commission finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACT
1. Plaintiff is 44 years old and attended high school until the 12th grade, but did not obtain a high school diploma. Plaintiff has not worked since his last day of employment with Defendant on February 10, 2001.
2. Plaintiff became employed with Defendant on or about June 2, 1998 as a laundry machine operator. His job duties included loading jeans and rocks into washers and then removing them and separating the rocks from the jeans. Hoists were used to load the washers and the washers would tilt forward to allow the laundry to be removed from the washer. Around April 1999, Plaintiff started driving a forklift one day a week and continued in the laundry machine operator position for the remainder of the week. Plaintiff continued on this work schedule for the remainder of his employment with Defendant.
3. This was a production job and the pay would vary depending on individual production. Plaintiff operated three to four washing machines at a time. The bags of jeans would have a ticket on them to let the operator know what program to set the washing machines on and then the machines would wash the jeans from nine minutes to two hours depending on the program. When the load was done, Plaintiff would remove the jeans and de-stone the jeans, which required holding the jeans up by the finger tips and shaking the jeans to remove stones from the inside of the jeans and then reaching into every pocket to remove the stones left in each pocket.
4. The buckets of stone that went into the washers weighed approximately 20 to 25 pounds and the amount of stone required in the different program settings would vary from four to about nine buckets according to Plaintiff's testimony.
5. Plaintiff testified that he would do nine to 11 bags of jeans per day and each bag contained 60 to 120 pairs of jeans. Plaintiff had to handle between 540 and 1,320 pairs of jeans during a normal eight hour shift. With the minimum number of 540 pairs of jeans, Plaintiff would have to handle over 67 pairs of jeans per hour in addition to the other duties of the washing machine operator. This work required the constant use of the upper extremities to handle the large number of jeans and remove the stones from all the pockets and legs of the jeans.
6. Mike Hellard, first shift laundry and pressing manager, testified that the video submitted as Stipulated Exhibit No. 2 was an accurate depiction of Plaintiff's job. Mr. Hellard testified that it was late March or early April 1999 when Plaintiff started working a five day week that included one day in which he operated a forklift. Plaintiff's testimony regarding his job duties was corroborated by the video.
7. A June 16, 2000 doctors note from Dr. Reddix, Plaintiff's primary care physician, indicates Plaintiff complained of hand and arm numbness and was referred to Dr. Whitmer.
8. Plaintiff presented to Dr. Whitmer on June 29, 2000 with diffuse tenderness over the volar aspects of both wrists, mild limitation in flexion and extension bilaterally, positive Tinel's sign and Phalen's sign at the left carpal tunnel, negative Tinel's sign and positive Phalen's sign on the right, and mild to moderate grip strength weakness on the left. Dr. Whitmer's impression was bilateral carpal tunnel syndrome with left greater than the right. Plaintiff was then restricted from repetitive motion with the wrists and EMG/nerve conduction studies were ordered for both upper extremities.
9. Plaintiff was referred to Dr. Greg Nelson by Defendant and Dr. Nelson diagnosed Plaintiff with left and right carpal tunnel syndrome. Dr. Nelson performed a carpal tunnel release on Plaintiff's left hand on Friday, August 25, 2000. Dr. Nelson returned Plaintiff to work with Defendant on Monday, August 28, 2000 with restrictions of no lifting greater that five pounds and no repetitive work with his left hand.
10. Plaintiff spoke with Dr. Nelson by telephone on September 6 and 11 and complained of continued pain in his left wrist. Dr. Nelson saw Plaintiff on September 15, 2000 and continued to complain of pain in his hand and wrist. Plaintiff was told to remain on light duty for three to four weeks. Plaintiff was seen again on October 15, 2000. He was still experiencing problems and Dr. Nelson was not sure why, but recommended taking an anti-inflammatory. Plaintiff informed Dr. Nelson that he was thinking about getting a second opinion and did not want to consider surgery on his right wrist at that time. Dr. Nelson recommended using a splint on his right wrist at night and returned Plaintiff to his regular duties.
11. Plaintiff saw Dr. Nelson on December 15, 2000 and continued to complain of shooting pains that were like electrical shocks in his left hand and wrist. Plaintiff informed Dr. Nelson of his scheduled visit with Dr. Whitmer. Dr. Nelson recommended that Plaintiff have EMG's and nerve conduction tests repeated.
12. Plaintiff saw Dr. Whitmer on December 21, 2000 reporting pain in both hands and wrists. Plaintiff had positive Tinel's and Phalen's signs on the left and right wrists, as well as positive Tinel's sign at the ulnar nerve of the left elbow. Plaintiff wants to go ahead with right carpal tunnel release and Dr. Whitmer ordered a repeat EMG/nerve conduction study of the left side. The left side nerve studies showed persistent or recurrent left carpal tunnel syndrome as well as compression of the ulnar nerve at both the wrist and elbow.
13. Plaintiff continued to have problems with both hands and was kept out of work by Dr. Whitmer. At the June 15, 2001 visit, the nerve conduction studies showed a little improvement, but Plaintiff still having pain in his hands. Dr. Whitmer diagnosed mild de Quervain's tenosynovitis, left greater than right. Plaintiff was seen again on July 13, 2001, August 24, 2001, October 25, 2001, and January 24, 2002 for continued hand pain. Plaintiff was told to be seen in three months and at that time Dr. Whitmer would give permanent restrictions in regards to his hands after he underwent a functional capacity evaluation. Dr. Whitmer did not see Plaintiff subsequent to the January 24, 2002 visit.
14. Dr. Whitmer testified via deposition taken 5 November 2003, having watched the videotape of the plaintiff's job duties, that Plaintiff's job placed him at an increased risk of developing bilateral carpal tunnel syndrome than the general population and that Plaintiff's job was a significant contributing factor in the development of bilateral carpal tunnel syndrome. He said the general population has a certain risk of developing these conditions, but that the risk was greatly increased by the type of work Plaintiff was doing for Defendant.
15. Furthermore, Dr. Whitmer testified that plaintiff's current carpal tunnel syndrome condition was caused by his employment with defendant-employer.
16. Dr. Nelson did diagnose Plaintiff with bilateral carpal tunnel syndrome and operated on his left wrist, but then testified that Plaintiff's job did not place him at increased risk and did not contribute to Plaintiff's carpal tunnel or ulnar nerve problems. Dr. Nelson testified to various other things that have been linked to carpal tunnel syndrome, but he was unable to say that any of those were the cause of Plaintiff's problems. Dr. Nelson said he could not explain Plaintiff's problems with left wrist flexion post surgery. He then went on to testify that he did diagnose Plaintiff with left wrist tendonitis and that could cause difficulty with flexing of the wrist.
17. Dr. Nelson returned Plaintiff to full duty despite ongoing problems with both upper extremities. When asked why he returned Plaintiff to full duty when he was still experiencing problems, Dr. Nelson said it helps to get people back to their normal routines. Having considered Dr. Nelson's testimony that various factors or combination of factors could have caused Plaintiff's upper extremity problems, the fact that he could not say what the cause was yet he was certain that it was not the job with Defendant, and his willingness to return Plaintiff to full duty even though Plaintiff was still experiencing bilateral upper extremity pain, the undersigned places little weight on Dr. Nelson's testimony in this matter.
18. There is nothing in the evidence before the undersigned to indicate Plaintiff ever had any problems with his upper extremities prior to his employment with Defendant.
19. The Form 22 stipulated into evidence by the parties shows Plaintiff's average weekly wage to be $359.59, yielding an compensation rate of $239.74.
20. Debra Bradshaw, Human Resources Manager for Defendant, testified that Defendant's short-term disability plan was totally funded by Defendant. Plaintiff was paid $600.00 in short-term disability benefits for the first four weeks that he was out of work.
21. Defendant's defense of this claim was reasonable and Plaintiff is not entitled to an award of attorney's fee under N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff developed bilateral carpal tunnel syndrome, de Quervain's syndrome, and ulnar nerve problems on or about August 12, 1998 which was proximately caused by his regular duties working as a laundry machine operator in the course of his employment with Defendant. N.C. Gen. Stat. § 97-53(13).
2. Plaintiffs job duties as a laundry machine operator placed him at an increased risk of contracting bilateral carpal tunnel syndrome, de Quervain's syndrome, and ulnar nerve problems than members of the general public not so employed. N.C. Gen. Stat. §97-53(13).
3. As a direct and proximate result of his compensable occupational disease, Plaintiff was unable to engage in activities required by his job and is entitled to temporary total disability compensation at the rate of $239.74 per week from February 11, 2001 through the present and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to payment for all medical expenses related to Plaintiff's compensable injuries which are designed to effect a cure, give relief or lessen the period of Plaintiff's disability. N.C. Gen. Stat. § 97-25.
5. Defendant is entitled to a credit for the $600.00 paid to Plaintiff through the Defendant's short-term disability plan which was totally funded by Defendant.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. For Plaintiff's compensable occupational disease, Defendant shall pay temporary total disability compensation to plaintiff at the rate of $239.74 per week for the period from February 11, 2001 to the present and continuing until further order of the Commission. These amounts that have accrued shall be paid in a lump sum, subject to an attorneys fee set out below.
2. Defendant shall pay for all medical expenses related to Plaintiff's compensable occupational injuries which are designed to effect a cure, give relief or lessen the period of Plaintiff's disability.
3. A reasonable attorneys fee of 25% of the compensation due under Paragraph 1 of this Award is approved for Plaintiff's attorney. Of the lump sum that has accrued, Defendant shall pay 25 percent of that sum directly to Plaintiff's attorney and thereafter, every fourth check shall be paid directly to Plaintiff's attorney.
4. Defendant is entitled to a credit for the $600.00 paid to Plaintiff through the Defendant's short-term disability plan which was totally funded by Defendant.
5. Defendant shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER